IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| **INSIGHT INVESTMENTS, LLC** | § | |
| | § | |
| **v.** | § | **NO. 4:18-CV-00531-BD** |
| | § | |
| **ECHO DCL, LLC** | § | |

## MEMORANDUM OPINION AND ORDER

In this diversity case, third-party defendant Echo DCL, LLC, moved for partial summary judgment against plaintiff Insight Investments, LLC, Dkt. 175; *see* Dkt. 177 (response). Insight also moved for summary judgment. Dkt. 178; *see* Dkts. 179 (response), 180 (reply). Echo's motion will be denied, Insight's motion will be granted in part, and all of Echo's remaining claims, Dkt. 163, will be dismissed.

## BACKGROUND

### I.   Underlying Agreements and Disputes

Through an agreement that the parties call "the subcontract," *e.g.*, Dkt. 175 at 7 (referencing Dkt. 175-2), Icon Construction, Inc., contracted with United Excel Corporation to build a modular office building known as the "temporary phasing facility" ("TPF"), *id.* at 2. The TPF served as a temporary medical facility for use while United was renovating an Air Force base. *Id.* Icon leased the TPF to United to be "occupied by the [Air Force] for a period of 20 months at a monthly lease rate of $19,000 per month." Dkt. 175-2 at 2. Icon and United also agreed to other obligations related to preparing and later dismantling the TPF. *Id.* at 23–29.

Icon also contracted with Insight to finance construction of the TPF. The parties call that contract the "master lease agreement." Dkt. 175-3; *see* Dkt. 175 at 5. It purported to vest ownership of the TPF in Insight, which would retain a security interest while leasing it to Icon. Dkt. 175-3 at 2. A schedule to that contract, which the parties call the "net lease agreement," *see* Dkt. 175 at 5, set the lease term at 20 months with a monthly rent of $19,000. Dkt. 175-4 at 1. Those terms matched the terms of Icon's lease to United. Dkt. 175-2 at 2.

To summarize, Insight funded construction of the TPF, which Icon built and Insight owned. Insight leased the TPF to Icon, which leased it to United, which provided it to the Air Force. The Air Force was set to pay United, which would pay Icon, which would pay Insight.

But a dispute arose between United and Icon.  That dispute resulted in United not paying Icon, so Icon did not pay Insight. Insight sued both Icon and United, alleging that it and Icon had executed an amended agreement in which Icon agreed to direct United to make all payments due under the subcontract directly to Insight. Dkts. 1 at 3, 1-6. Insight asserted three claims against Icon and United: unjust enrichment, trespass to chattels, and conversion. Dkt. 1 at 5–7. It also asserted breach of contract and judicial foreclosure against Icon alone. *Id.* at 4–5, 7. United moved to dismiss. Dkt. 12. Icon answered and asserted counterclaims against Insight for usury. Dkt. 13 at 6–8. Insight moved to dismiss those counterclaims. Dkt. 27.

## II.  Assignments of Icon's Claims Against United

Then Icon declared bankruptcy. *See* Dkt. 44. During the bankruptcy proceedings, Icon assigned "all of [its] legal and beneficial right, title, interest in and ownership of [its] claims against [United] arising under [the subcontract]" to Insight. Dkt. 175-5 at 1. In that contract, Icon and Insight agreed to release certain claims identified in the contract between them. *Id.* at 4.

United moved to compel Insight to arbitrate based on the subcontract between United and Icon. Dkt. 60 at 5–6. Because Icon had assigned its claims arising under the subcontract to Insight, United argued that Insight, standing in the shoes of Icon, was bound by the subcontract's arbitration provision. *See id.* The court denied the motion to compel arbitration because Insight's claims against United were its own equitable claims, not the contract claims Icon had assigned it. Dkts. 75 at 4–6, 83. Insight's claims, which predated the assignment agreement, were not subject to the subcontract's arbitration provision. *See id.* at 4–6.

Shortly after the court denied United's motion to compel arbitration, Echo entered the fray. It purchased "all the assets" of Icon—which, despite Icon's earlier assignment to Insight, included "all [of Icon's] claims, causes of action, and rights against [United]." Dkt. 175-6 at 13. Later that

2

year, Insight reassigned Icon's claims against United under the subcontract back to Icon so that Icon could pursue them in a different court. Dkt. 175-7 at 1; *see also* Dkt. 178-1 at 3 (affidavit of Insight's general counsel explaining the reason for the reassignment). Icon in turn assigned those claims to Echo. Dkt. 175-8 at 1–2.

To summarize again, after Insight sued Icon and United, Icon assigned its legal and beneficial (i.e., equitable) claims against United to Insight. Echo also purported to purchase Icon's claims against United and Icon's other assets. Insight reassigned Icon's contract claims against United to Icon. Icon assigned those claims to Echo.

### III. Removal of the TPF

Almost three years after this case began, United's counsel informed Insight's counsel that the Air Force needed the TPF removed. Dkt. 178-6 at 2–3. Insight's counsel forwarded that email to Echo's counsel, asking whether "Echo had any interest in purchasing the [TPF]." *Id.* at 2. Echo's counsel responded that he did not believe that "Echo ha[d] any interest in the building if Insight want[ed] it and [could] remove it at its own expense." *Id.* at 1. He said that he would advise Insight's counsel "if that position changes." *Id.* Insight dismantled, reconditioned, and relet the TPF. *See* Dkt. 178-1.

### IV. Claims By and Against Echo

United moved to dismiss based on Insight's reassignment of Icon's claims, then answered and asserted counterclaims and crossclaims against Insight and Icon, respectively. United also impleaded Echo, seeking a declaration of which party, if any, was entitled to receive rent payments from United for use of the TPF. Dkt. 128 at 10–13. Echo pleaded counterclaims against United and claims against Insight. Dkt. 141. Echo alleged that, "by continuing to pursue this litigation," Insight was in breach of its reassignment agreement with Icon. *Id.* at 5–6. Insight moved to dismiss Echo's claims and for sanctions. Dkt. 142. United answered Echo's counterclaims. *See* Dkt. 143.

## V. The Remaining Claims

Insight and Icon settled, agreeing to "mutually release and dismiss each other from" the case and to "release and forever discharge each other . . . from any and all past, present[,] or future obligations on any contracts which have existed or may now exist." Dkt. 175-9 at 1. The claims and counterclaims between Insight and Icon were dismissed. Dkts. 136, 138. Insight and United agreed to a confidential settlement, *see* Dkt. 156 at 1–2 (sealed), and the claims and counterclaims between them were also dismissed, Dkts. 144, 145. United and Echo voluntarily dismissed their claims against one another and opted to arbitrate. Dkts. 147, 149. United and Icon also agreed to arbitrate, and United voluntarily dismissed its claims against Icon. Dkts. 150, 153. The only remaining claims are Echo's claims against Insight.

Echo moved for leave to amend those claims after it learned of the confidential settlement agreement between Insight and United. Dkt. 155 at 2. According to Echo, its claims against Insight concern "the transfer of Insight's claims against [United] back to Icon and[,] consequently[,] to Echo." *Id.* at 2. Echo alleges that Insight usurped those claims by continuing to pursue them. *Id.* The court granted Echo leave to amend. Dkt. 161 at 20. It also denied Insight's motion to dismiss and for sanctions. *Id.*

Echo's amended pleading asserts four causes of action against Insight: breach of contract, money had and received, conversion, and tortious interference with contract. Dkt. 163 at 7–10. It also seeks declarations that it owns the claims against United arising out of the subcontract; that only it, not Insight, was entitled to pursue those claims; and that the master and net lease agreements and "the assignment of claims agreement never existed *ab initio*." *Id.* at 7–8.

## VI. The Motions for Summary Judgment

Echo moved for summary judgment on its claims for breach of contract, conversion, and money had and received. Dkt. 175 at 18–23. Insight responded, Dkt. 177, and filed its own motion for summary judgment on all of Echo's claims against it. Dkt. 178; *see* Dkts. 179 (response); 180 (reply). The court ordered supplemental briefing on which State's law applies and whether subject-matter jurisdiction over Echo's claims exists. Dkts. 185, 191; *see* Dkts. 186 (Echo's first

4

supplemental pleading), 187 (Insight's choice-of-law briefing), 188 (Echo's choice-of-law briefing), 189 (Echo's second supplemental pleading), 192 (Echo's third supplemental pleading in response to court order, Dkt. 191), 194 (Echo's fourth supplemental pleading in response to court order, Dkt. 193).

Echo argues that Insight's claims against United were, in reality, Icon's contract claims. Dkt. 175 at 14–15. In Echo's view, because Insight reassigned those claims to Icon, which assigned them to Echo, they were Echo's claims, not Insight's. *Id.* Echo therefore claims entitlement to the proceeds of Insight and United's settlement. *Id.* Echo also argues that Icon and Insight's settlement voided the contract under which Insight claimed an ownership interest in the TPF. *Id.* at 17. Echo contends that Insight's claim of TPF ownership reverted to Icon and was included in the assignment of rights to Echo. *Id.* at 18. Based on that theory, Echo argues that the value of the TPF, less the debt Icon owed to Insight, belongs to Echo. *Id.*

In its motion for summary judgment, Insight argues that its claims against United were distinct from the claims assigned to Echo, so Echo has no right to the settlement proceeds. Dkt. 178 at 8–10. Insight also asserts that Echo is estopped from arguing otherwise. *Id.* at 11–12. As to the value of the TPF, Insight asserts that Echo waived any claim to the TPF. *Id.* at 15.

## SUMMARY-JUDGMENT STANDARD

A summary-judgment movant bears the initial burden of demonstrating, by reference to record evidence, if necessary, that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if, under the governing substantive law, it could affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When the nonmovant would bear the burden of proof at trial, the movant may carry its initial summary-judgment burden by asserting that "the nonmovant has failed to establish an element essential to" its case. *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017). The nonmovant may then avoid summary judgment by demonstrating the existence of a genuine issue of material

fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[A] party opposing a properly-supported summary judgment motion may not rest upon mere allegations contained in the pleadings, but must set forth and support by summary judgment evidence specific facts showing the existence of a genuine issue for trial." *Johnson v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, 90 F.4th 449, 460 (5th Cir. 2024) (quotation marks omitted). Although the court must resolve all reasonable doubts in the nonmovant's favor, *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. Unit B Sept. 1981), "[c]onclusional allegations and denials, speculation, and unsupported assertions are insufficient to avoid summary judgment," *Sanches v. Carrollton-Farmers Branch ISD*, 647 F.3d 156, 165 (5th Cir. 2011).

When presented with cross-motions for summary judgment, the court considers "each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Morgan v. Plano ISD*, 589 F.3d 740, 745 (5th Cir. 2009). "[E]ach movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538–39 (5th Cir. 2004). Summary judgment is appropriate on cross-motions "[i]f there is no genuine issue and one of the parties is entitled to prevail as a matter of law." *Id.* at 539.

## DISCUSSION

### I.  Preliminary Issues

Before the court may address the merits, it must resolve the question it raised regarding subject-matter jurisdiction. It will also consider whether Echo's claims were released and whether Echo has waived or is estopped from pursuing its claims. None of those issues is a barrier to further analysis of the cross-motions for summary judgment.

### A.  Subject-matter jurisdiction

"Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). When in doubt, courts "presume[]

that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id.*

Echo's claims against Insight are neither crossclaims nor counterclaims. *See* Fed. R. Civ. P. 13 (allowing for counterclaims against opposing parties and crossclaims against coparties). Nor are they third-party claims, which can ride the jurisdictional coattails of the original claims. *See Velazquez v. De La Rose Martinez*, No. 21-40282, 2021 WL 6140246, at *1 (5th Cir. Dec. 29, 2021) (explaining that "complete diversity need not exist between a third-party claimant and a third-party defendant, so long as the district court has subject-matter jurisdiction over the underlying suit"). Although Echo refers to its claims against Insight as "crossclaims," they are authorized by Federal Rule of Civil Procedure 14(a)(2)(D), not Rule 13(g), and are therefore properly categorized as "claims." *See* 6 Mary Kay Kane & Howard M. Erichson, Federal Practice & Procedure § 1407 (3d ed. 2025 supp.) (noting that "claims asserted by third-party defendants against the original plaintiff, as provided for in Rule 14(a)(2)(D), often are mistakenly labeled as counterclaims or crossclaims, although technically they are neither"). Because Echo's claims against Insight are independent, the court must consider whether it has subject-matter jurisdiction to consider them.

Echo seeks to establish jurisdiction under 28 U.S.C. § 1332 based on diversity of the parties' citizenships. Dkt. 186. That statute requires "complete diversity." *MidCap Media Fin., L.L.C. v. Pathway Data, Inc.*, 929 F.3d 310, 313 (5th Cir. 2019). In other words, "all persons on one side of the controversy [must] be citizens of different states than all persons on the other side." *Id.* "Because federal courts have limited jurisdiction, parties must make 'clear, distinct, and precise affirmative jurisdictional allegations' in their pleadings." *Id.* (quoting *Getty Oil Corp. v. Ins. Co. of N. Am.*, 841 F.2d 1254, 1259 (5th Cir. 1988)). The requisite allegations differ based on the type of party.

Insight is a limited liability company ("LLC"). Dkt. 192 at 3. An LLC's citizenship is that of each of its members. *Megalomedia Inc. v. Phila. Indem. Ins. Co.*, 115 F.4th 657, 659 (5th Cir. 2024). Insight has just one member, Insight Investments Holdings, LLC. Dkt. 192 at 3. An LLC itself, that entity also has just one member, Insight Investments Corp. *Id.* A corporation is "a citizen of every

7

State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business." 28 U.S.C. § 1332(c)(1). Insight Investments Corp. is incorporated in California and has its principal place of business there. Dkt. 192 at 3. That makes Insight Investments Corp. a citizen of California, which makes Insight Investments Holdings, LLC, a citizen of California, which makes Insight a citizen of California.

Determining Echo's citizenship is more complicated. Echo first filed its claims against Insight in December 2021. Dkt. 141. It amended those claims in October 2022. Dkt. 163. Echo's citizenship apparently changed between those pleadings. *See* Dkt. 186.

"It has long been the case that 'the jurisdiction of the court depends upon the state of things at the time of the action brought.'" *Grupo Dataflux v. Atlas Glob. Group, L.P.*, 541 U.S. 567, 570 (2004) (quoting *Mollan v. Torrance*, 22 U.S. 537, 539 (1824)); *see* Dkt. 193 at 4–5 (rejecting Echo's argument that *Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22 (2025), overturned *Grupo Dataflux*). Here, that means when Echo, an LLC, first filed its claims against Insight. And when, as here, one of an LLC's members is also an LLC, discussion of its citizenship sometimes "ends up looking like a factor tree that exponentially expands every time a member turns out to be another LLC." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1220 (11th Cir. 2017).

At the relevant time, Echo had three members: Skyward Forge LP and two individuals, Sasha Bell and Conrad Keller. Dkt. 194 at 3–4. Bell and Keller were citizens of Texas. *Id.* Skyward Forge LP was a limited partnership. Like that of an LLC, "[t]he citizenship of a limited partnership is based upon the citizenship of each of its partners." *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1079 (5th Cir. 2008). Skyward Forge LP had two partners, Skyward Forge GP, LLC, and Chris Jarrard. *Id.* at 3. Skyward Forge GP, LLC, had two members, Chris Jarrard and Michael Jarrard, both individuals and citizens of Texas. *Id.* Because Michael and Chris Jarrard are citizens of Texas, so is Skyward Forge GP, LLC, and Skyward Forge LP—and, consequently, Echo.

To recap, Insight was a citizen of California at the relevant time. Echo was a citizen of Texas. That means complete diversity exists. And there is no question that § 1332(a)'s amount-in-

controversy requirement is satisfied. *See* Dkt. 175 at 23 (seeking the proceeds of Insight's settlement with United "*plus* $390,000").

### B. Mutual release

Echo's claims derive from Icon's. Insight asserts that, "[a]s shown in the Assignment and Reassignment Agreements, Icon released all claims against Insight prior to Echo's asset purchase." Dkt. 178 at 14. Insight makes the same assertion in its statement of undisputed facts. *See id.* at 3. On that basis, Insight concludes that the mutual release "Bars All [of] Echo's Claims." *Id.* at 14. The court disagrees.

The assignment agreement between Icon and Insight includes a choice-of-law provision stating that the agreement "shall be governed by and construed in accordance with the laws of the state of Texas in all respects, including matters of construction, interpretation, validity and enforcement." Dkt. 175-5 at 5. Texas law therefore applies. *See infra* Part II.A.2.a (explaining the applicable conflict-of-laws framework).

Under Texas law, "a release is a contract" and is interpreted as such. *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990). The contractual language at issue here states that

> [e]ach party agrees, represents and warrants this Agreement is an unlimited release of all claims described above against the named or described persons that the Party or the Party's Releasing Parties (as described above) currently has or might have as well as all future claims described above as released.

Dkt. 175-5 at 4. The "claims described above," *id.*, are not, as Insight asserts, "all claims against Insight," Dkt. 178 at 14. They are instead Icon's "counterclaims against Insight in Case 4:18-00531 in the United States District Court for the Eastern District of Texas – Sherman Division" (this case). Dkt. 175-5 at 1, 4. That language does not identify all of Icon's claims, but only its counterclaims against Insight. In other words, it covers the usury claims Icon pleaded in its answer based on the interest Insight charged after Icon stopped paying its debt. Dkt. 13 at 6–8. Further, Echo was not assigned Icon's counterclaims against Insight; it was assigned Icon's claims against United. Dkts. 175-8 at 2, 178-13 at 1. Echo's current claims, though seeking to enforce rights that

9

Echo bought from Icon, are Echo's own claims, independent of and unrelated to Icon's usury claims, so they are not covered by the release.

### C. Waiver and estoppel

Insight argues that Echo disclaimed any interest in the TPF and waived its right to assert ownership. *See* Dkt. 178 at 14. Insight relies on an email in which Echo's counsel told United's then-counsel: "I don't believe Echo has any interest in the [TPF] if Insight wants it and can remove it at its own expense. I will advise you if that position changes." Dkt. 178-8 at 1. Based on that email, Insight concludes that Echo "intentionally relinquished any . . . right" to the TPF. Dkt. 178 at 15. Again, the court disagrees.

"Waiver is the intentional relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right." *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008). Waiver is established by proof of: "(1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right." *Id.* Although waiver is "ordinarily a question of fact," when "the facts and circumstances are admitted or clearly established, . . . the question becomes one of law." *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996).

The email from Echo's counsel is equivocal, indicating a lack of knowledge on the issue. Indeed, Echo's counsel stated that he did not "believe" Echo had an interest in the TPF but that he would notify counsel "if that position changes." Dkt. 178-8 at 1. It is not clear from the email whether Echo knew it had any right to the TPF or intended to waive that right. *See, e.g.*, *Recursion Software, Inc. v. Double-Take Software, Inc.*, No. 4:10-cv-403, 2012 WL 13162866, at *6 (E.D. Tex. May 4, 2012) (concluding that fact questions precluded summary judgment on grounds of waiver where the facts regarding the plaintiff's knowledge and intent were ambiguous), *report and recommendation adopted in part and overruled in part on other grounds,* 2012 WL 13162891 (E.D. Tex. May 31, 2012).

10

Insight also contends that Echo is estopped from claiming ownership of the TPF "because of Insight's prejudicial reliance on Echo's disclaimer in paying $106,008.00 to . . . recover the TPF, another $295,851.89 to recondition it, and thousands of dollars in legal fees and costs to pursue its unjust enrichment claim and eventual settlement with [United]." Dkt. 178 at 15. But Insight neither specifies the particular estoppel doctrine it relies on nor explains how the undisputed facts constitute the elements of its defense. *See id.*

Insight may be attempting to rely on quasi-estoppel principles. *See id.* (citing *Kramer v. Kastleman*, 508 S.W.3d 211, 217 (Tex. 2017), for the proposition that estoppel "prevents litigants from taking contradictory positions as a means of gaining an unfair advantage"). Quasi estoppel is an affirmative defense that "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken." *Samson Expl., LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 778 (Tex. 2017). "The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Id.* (quoting *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000)).

Insight does not explain why it would be unconscionable for Echo to claim ownership of the TPF despite its ambiguous expression in the email. *See* Dkt. 178 at 15. Nor does Insight explain why it would be unconscionable for Echo to maintain its claims over Insight's investment recovering and reconditioning the TPF. Insight appears to have recouped that investment already. *See* Dkts. 156 at 1 (sealed settlement with United), 175-13 at 130 (deposition of Insight's corporate representative valuing the TPF at "[a]nywhere between [$]600,000 and $800,000"), 178-1 at 4 (declaration of Insight's general counsel noting that "Insight was able to lease the TPF again with a twelve month lease, which if fulfilled will ultimately pay a total of $444,540.00 in payments"). For that reason, it is not clear that Insight has incurred any outstanding expense in reliance on Echo's previous statements, so it may not properly claim quasi-estoppel.

## II.  Merits

Echo moves for summary judgment on its claims for breach of contract, conversion, and money had and received—that is, all claims except its tortious-interference claim. Dkt. 175. It argues that Insight breached the reassignment agreement (between Insight and Icon) by pursuing claims against United that Icon assigned to it and by misappropriating ownership of the TPF. *Id.* at 17–19. In support of its conversion claim, Echo argues that it has a right to the money that Insight received from United for lost use or rental proceeds. *Id.* at 21. Similarly, Echo's claim for money had and received is based on its alleged right to receive payments made by United to settle Insight's claim for loss of use. *Id.* at 22–23. Insight moves for summary judgment on each of Echo's claims, targeting Echo's claimed entitlement to the TPF and the settlement proceeds. Insight is entitled to summary judgment; Echo is not.

### A.  Breach of contract

Echo's breach-of-contract claim is based on two theories. First, Echo argues that, in settling its claims with United, Insight received and retained settlement proceeds that belonged to Echo. Dkt. 175 at 14–17. Second, Echo argues that Insight wrongfully took possession of its property— the TPF. *Id.* at 17–18. Neither theory supports Echo's claim.

#### 1.  Settlement proceeds

Echo asserts that, by settling its unjust-enrichment claim against United, Insight wrongfully appropriated funds that belonged to Echo under the reassignment agreement. *Id.* at 4. It makes three arguments in support of that assertion. First, Echo argues that, despite nominally asserting an unjust-enrichment claim against United, Insight actually asserted Icon's contract claims arising under the subcontract. *See id.* at 10–11. Second, Echo argues that, because the TPF is covered by a "valid express contract," Insight could not prevail on its equitable claims against United. *See id.* at 14–15. Third, Echo argues that Insight gave up the right to pursue any claims against United when it settled and released its claims against Icon. *See id.* at 16–17. Based on those arguments, Echo contends that Insight pursued a claim that Icon had assigned to it. *See id.* at 14–17. But each of those arguments fails.

12

### a. Disguised claim

Echo argues that Insight asserted Icon's contract claims against United but disguised them as an unjust-enrichment claim. *See id.* at 18–20. That argument is based on Insight's prayer for damages in the amount of payments set out in the lease agreement between Insight and Icon and the subcontract between Icon and United. *See id.* at 14–15.

Insight argues that it had the right to assert and settle its unjust-enrichment claim against United. *See* Dkt. 178 at 8. That claim was not transformed into a contract claim, Insight maintains, just because the damages are determined by reference to the consideration underlying the contract. *Id.* Further, Insight argues that it did not transfer its own equitable claims against United when it entered the reassignment agreement with Icon. *Id.* Based on those assertions, Insight concludes that Echo cannot maintain claims on the theory that Insight wrongfully intercepted Echo's settlement proceeds. *Id.*

Echo replies that it never claimed that Insight's claim was "transformed" from an equitable claim to a contract claim. Dkt. 179 at 15. It asserts that, "when a valid and enforceable agreement exists, one is precluded from making a claim in equity on the subject matter thereof." Dkt. 179 at 16; *see id.* at 19–20. True though that abstract statement of law may be, Echo does not adequately support is position that, by measuring its damages by the benefit United received from its use of the TPF, Insight asserted Icon's contract claims against United. *See* Dkt. 175. It is unclear what other metric Insight could have used to measure "the reasonable value of the work performed and the materials furnished." *Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 736 (Tex. 2018) (discussing the measure of damages for quantum-meruit or unjust-enrichment claims).

Insight asserted its own unjust-enrichment claim against United independent of any claim assigned by Icon. Insight in fact asserted that claim before Icon had assigned any claims to any party. *See* Dkt. 1. Echo, meanwhile, separately asserted, litigated, and received an arbitration award on the contract claims Icon assigned to it. *See* Dkts. 175-8 at 1; 188-1. The unjust-enrichment claim may or may not have had merit. Indeed, United argued, as Echo does now, that the existence of an express contract precluded Insight's recovery in equity. *See* Dkts. 12 at 7, 112 at 7. But the court

had no occasion to address that issue. The possibility that Insight's unjust-enrichment claim might have been defeated by an affirmative defense did not preclude Insight from bringing that claim and United from settling it.

In support of its contrary position, Echo cites *Parks v. Dumas*, a case involving a defendant who murdered his parents and inherited their property. 321 S.W.2d 653, 654 (Tex. App.—Fort Worth 1959, no writ). The *Parks* court held that, where "legal title to property" is acquired "in an unconscientious manner," the property becomes subject to a constructive trust "in favor of the one who is in good conscience entitled to it, and who is considered in equity as the beneficial owner." *Id.* at 655–56. Echo argues that *Parks* governs this case because "Insight wrongfully asserted Echo's exclusive rights in this lawsuit." *See* Dkt. 179 at 19. But *Parks* provides no guidance here. Even assuming its reasoning would apply if Insight had "wrongfully asserted Echo's exclusive rights," *id.*, it of course does nothing to establish that Insight actually did so.

Insight did not assign its equitable claims against United to Icon. The language of the reassignment agreement is unambiguous on that point: it reassigned "Icon's claims against [United] arising under [the subcontract]"—that is, the contract between Icon and United. Dkt. 175-7 at 1. Echo has not established that Insight's equitable claims against United were in fact contract claims, so it does not have a valid claim to the proceeds of Insight and United's settlement.

### b. Existence of an express contract

Echo also argues that, because there is a "valid express contract" (the subcontract, covering the TPF), Insight could not prevail on its unjust-enrichment claim against United. Dkt. 175 at 14–15. As Echo puts it, "[s]imply rephrasing a cause of action in equity where a valid and express written contract covers the subject matter thereof, is inadequate." *Id.* at 15.

It is not clear why Echo believes that the existence of an express contract entitles it to summary judgment on any specific claim. The existence of an express contract is an affirmative defense to an unjust-enrichment claim. *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000) (explaining that the existence of a valid contract precludes recovery under quasi-contract theories,

14

including unjust enrichment). As such, the defendant has the burden to prove that an express contract precludes recovery. *Rise Above Steel Co., LLC v. Liberty Mut. Ins. Co.*, 656 S.W.3d 577, 586 (Tex. App.—El Paso 2022, no pet.) (noting that an express contract was the basis for an affirmative defense to a quantum-meruit claim). Echo does not explain why United's affirmative defense barred Insight from settling its claim against United. United raised the express-contract defense in its two motions to dismiss. Dkts. 12 at 6–9, 112 at 5–8. But rather than face a possible adverse ruling, it settled before the court addressed that defense. Dkt. 144. It was free to make that decision. *See, e.g.*, *Mackey v. Johnson*, 868 F.3d 726, 729 (8th Cir. 2017) (concluding that the merits of a settled claim were "beside the point" because the "parties can contract to settle any claim, even if the claim has little support in the law").

Echo further contends that, even if Insight could prevail on its equitable claims against United, Insight expressly assigned those claims to Icon, which assigned them to Echo. Dkt. 175 at 20. It asserts that the reassignment agreement assigned all of Insight's "legal *and beneficial* right, title, interest in and ownership of Icon's claims against [United]" back to Icon. *See id.* Icon, in turn, assigned those interests to Echo. Dkt. 175-8 at 1–2. Echo argues that the word "beneficial" indicates that the reassignment agreement assigned any equitable claims Insight had to Icon, which assigned them to Echo. *Id.*

But the language of the reassignment agreement precludes that interpretation. Echo focuses on a single word, "beneficial," while ignoring the phrase "[I]con's claims against [United] arising under [the subcontract]." *See* Dkt. 175-7 at 1. Echo cannot pick and choose which words have effect and which do not. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (explaining that "courts should examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless"). Insight never assigned its own claims, beneficial or otherwise. Again, it assigned "[I]con's claims against [United]." Dkt. 175-7 at 1. As noted, the claims Insight settled with United were its own, not Icon's. Whether those claims had merit is a different question. But it is one the court need not address because it does not affect the propriety of Insight and United's settlement.

15

### c. Mutual release

Finally, Echo argues that the lease agreements were "voided *ab initio*" by Insight's mutual release with Icon. Dkt. 175 at 11, 16–17. According to Echo, because the lease agreements were "contractually rescinded by the mutual releases," Insight "lost standing through the doctrine of mootness" to assert claims against United. *Id.* at 17. Once again, Echo does not explain why the justiciability of Insight's claims, long since settled, entitles it to summary judgment. Nor does Echo explain why Insight was prohibited from settling its claims—justiciable or not. So this contention, too, provides no basis for the court to grant relief to Echo.

### 2. Ownership of the TPF

Echo asserts a right to proceeds from Insight's supposed sale of the TPF. It makes two arguments in support of that assertion. First, it argues that the lease agreement between Icon and Insight actually created a security interest, rather than a lease, so Icon, not Insight, owned the TPF before Icon's bankruptcy. Dkt. 175 at 7–8. Second, Echo argues that Insight transferred its interest in the TPF to Icon through the reassignment agreement. *Id.* at 17–18. Under either theory, Echo claims it bought Icon's interest in the TPF when it purchased Icon's assets during the bankruptcy proceeding. Echo therefore asserts that it owns the TPF and is entitled to any value derived from it. *Id.* at 7–8, 17–18. Neither argument has merit.

### a. Disguised security interest

Echo contends that the master lease agreement does not make Insight the owner of the TPF but instead effected a disguised sale with a security interest. The court ordered the parties to file supplemental briefs discussing which State's law governs that agreement. Dkt. 185. Based on the contract's choice-of-law provision, Insight argues that California law governs the ownership of the TPF. Dkt. 187 at 2. Echo failed to argue which State's law applies.

A federal court sitting in diversity applies the conflict-of-laws rule of the State in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Under Texas law, a contract's choice-of-law provision is enforceable unless

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of applicable law in the absence of an effective choice of law by the parties.

*Exxon Mobil Corp. v. Drennen*, 452 S.W.3d 319, 325 (Tex. 2014) (quoting Restatement (Second) of Contracts § 187(2) (A.L.I. 1971)). Application of another State's law "is not contrary to the fundamental policy of the forum merely because it leads to a different result[] or is materially different." *Barnett v. DynCorp Int'l, L.L.C.*, 831 F.3d 296, 306 (5th Cir. 2016) (quotation marks omitted). Instead, the focus

is on whether the law in question is a part of state policy so fundamental that the courts of the state will refuse to enforce an agreement contrary to that law, despite the parties' original intentions, and even though the agreement would be enforceable in another state connected with the transaction.

*Id.* (quoting *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 680 (Tex. 1990)).

Here, the master lease agreement states that it is to be "governed by the laws of the State of California." Dkt. 175-3 at 8. Neither Insight nor Echo disputes the applicability of California law, argues that California lacks a reasonable relationship with the master lease agreement, or contends that the application of California law would violate a fundamental public policy of Texas. *See* Dkts. 187, 188. Likewise, the court finds that California has a reasonable relationship with the master lease agreement because one of the parties to the contract is a California entity. The application of California law would not violate a fundamental policy of Texas. So California law governs this dispute.

Under that law, "simply calling an instrument a lease does not make it a lease." *Davis v. Fresno Unified Sch. Dist.*, 271 Cal. Rptr. 3d 818, 825 n.2 (Cal. Ct. App. 2020) (citing Cal. Com. Code § 1203(a)), *aff'd* 528 P.3d 1 (Cal. 2023). California Commercial Code § 1203(a) provides that "[w]hether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case." But that statute also creates a bright-line test:

17

> A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and:
>
>> (1) the original term of the lease is equal to or greater than the remaining economic life of the goods;
>>
>> (2) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;
>>
>> (3) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement; or
>>
>> (4) the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

Cal. Com. Code § 1203(b). "Goods," within the meaning of that statute, are "all things . . . which are movable at the time of identification." *Id.* at § 2105(1). The TPF is moveable, *see* Dkt. 1 at 2 (describing the TPF as "a transportable modular office building"), so it falls within the scope of "goods."

If an agreement that purports to create a lease unquestionably meets the conditions of § 1203(b), it is actually creates a security interest. *Addison v. Burnett*, 49 Cal. Rptr. 2d 132, 136–37 (Cal. Ct. App. 1996) (interpreting a prior version of § 1203). But if the statutory test is not conclusive, "the court must . . . resort to an examination of the facts of the case to determine whether the lessor has retained a 'meaningful residual interest' in the goods." *Id.* The statute lists several factors, including the lessee's assumption of risk of loss or its agreement to pay taxes, insurance, or maintenance costs, that courts should consider. Cal. Com. Code § 1203(c).

Echo asserts that, despite purporting "to establish ownership of the TPF in Insight," the master lease agreement is, "for all intents and purposes[,] a Financing Agreement." Dkt. 175 at 7–8. Echo relies on two facts to support that assertion. First, one of the subsections of the master lease agreement is titled "Financing." *Id.* at 8; Dkt. 175-3 at 1. Second, the agreement discusses Insight's intent to file a UCC filing statement, which it did. Dkts. 1-4, 175-3 at 2.

18

But Echo has failed to meet its summary-judgment burden to prove that there are no genuine issues of material fact on this point. *See In re Com. Money Ctr., Inc.*, 350 B.R. 465, 481 (B.A.P. 9th Cir. 2006) (citing *In re Pillowtex*, 349 F.3d 711, 716–71, 716 n.6 (3d Cir. 2003), which puts the burden of proof on the party seeking to recharacterize a lease). Just as labeling a transaction a lease does not necessarily make it so, calling a lease a financing agreement does not necessarily make it a disguised security-interest agreement. *See* Cal. Com. Code. § 1203(a) (providing that "[w]hether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case"); *cf. In re QDS Components, Inc.*, 292 B.R. 313, 344 (Bankr. S.D. Ohio 2002) (holding that, under California law, a lessor's status as a financier rather than a manufacturer was not dispositive in determining whether the purported lease was a disguised security-interest agreement).

Echo does not argue that the master lease agreement either meets the statutory test for a security interest or, if it does not, that Insight did not retain a meaningful residual interest in the TPF. *See* Dkt. 175. In fact, the master lease agreement provides that Insight agrees to file a financing statement "in order to perfect [its] security interest in the [TPF] in the event a [net lease agreement] is determined to be a lease intended as security." Dkt. 175-3 at 2. And Insight's UCC financing statement notes that it is "intended to be for informational and precautionary purposes only and to give notice of [Insight's] ownership of the [TPF] and the existence of a true lease." Dkt. 1-4 at 1. Based on those parts of the summary-judgment record, it appears that Insight and Icon intended the master lease agreement to be a true lease but anticipated a challenge like the one Echo now brings. Echo fails to argue, however, why the facts it identifies satisfy either the statutory test for creating a security interest or the fallback meaningful-residual-interest test. Having provided no argument on that point, Echo has not shown that the master lease agreement was a disguised security-interest agreement and Icon in fact owned the TPF.

Insight argues that, because the master lease agreement is not a disguised security-interest agreement under the bright-line test, it is the owner of the TPF. *See* Dkt. 187 at 4. But if it is wrong about application of the bright-line test, the question would be whether the "economic realities"

indicate that the lease was actually a disguised security-interest agreement. *See Prospect ECHN, Inc. v. Winthrop Res. Corp.*, 75 F.4th 885, 892 (8th Cir. 2023) (citations omitted). Insight did not engage with that question, and the record does not contain sufficient evidence for the court to decide it. *See Hollis v. R&R Rests., Inc*, 159 F.4th 677, 688 (9th Cir. 2025) (explaining that "the economic realities test is fact-bound, requiring application of all relevant factors to the particular facts" of the case), *petition for cert. filed,* No. 25-1024 (U.S. Feb. 17, 2026) (asserting error on other issues).

Still, the party seeking to re-characterize a transaction bears the burden of proof. *In re Com. Money Ctr.*, 350 B.R. at 481. Because Echo has not satisfied that burden, the court must apply the plain language of the contract. The contract states that "[Icon] acknowledges and agrees that [Insight] owns the [TPF]. [Icon's] interest is a possessory interest only[;] [Icon] obtains no title to [the TPF]." Dkt. 175-3 at 2. Because the contract unambiguously vests ownership of the TPF in Insight, Insight is entitled to summary judgment on that point.

### b.   Transfer of ownership through the reassignment agreement

Echo also argues that it owns the TPF by virtue of the reassignment agreement. Dkt. 175 at 17–18. But the language of that agreement does not support its argument.

In its supplemental brief, Insight argues, based on a choice-of-law provision, that the reassignment agreement is governed by Texas law. Dkt. 187 at 5. Once again, Echo fails to argue which State's law applies and instead discusses the issue under the laws of Texas, California, and Oklahoma. Dkt. 188 at 2–7. Because the choice-of-law provision does not violate a fundamental policy of Texas and one of the parties is a Texas entity, the provision governs, so Texas law applies. *See supra* Part II.A.2.a; Dkt. 175-7 at 3 (providing that "[t]his Assignment shall be governed by and construed in accordance with the laws of the state of Texas in all respects, including matters of construction, interpretation, validity and enforcement without reference to conflict of laws principles").

Under Texas law, the court must give effect to the parties' intent as expressed in the contract's language and interpret that language according to its "plain, ordinary, and generally accepted meaning." *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 888 (Tex. 2019). A contract is unambiguous, such that the court must give effect to its plain language, if it can "be given a certain or definite legal meaning." *Id.*

Although Echo argues that it obtained an ownership interest in the TPF through the reassignment agreement, Dkt. 175 at 17–18, the basis for that argument is unclear. Echo could be asserting that, because Icon had a duty under the subcontract to "Tear Down and Remove" the TPF at the lease's end, Dkt. 175-2 at 24, Echo became the owner of the TPF when that right was assigned and reassigned from Icon to Insight, from Insight back to Icon, and then from Icon to Echo, Dkt. 175 at 12, 17–18. Through the assignment agreement, Icon assigned to Insight all of its "beneficial right, title, interest in and ownership of Icon's claims against [United] arising under [the subcontract]." Dkt. 175-5 at 1. But it did not assign any other rights or obligations. The obligation to dismantle the TPF was not a claim of any sort, much less a claim against United, so Insight did not acquire it from Icon and, therefore, could not transfer that obligation back to Icon through the reassignment agreement. *See Claim*, Black's L. Dict. (11th ed. 2019) (defining "claim" as "[t]he assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional," or "[a] demand for money, property, or a legal remedy to which one asserts a right"). And even if that obligation was transferred, an obligation to dismantle the TPF at the conclusion of the lease is not an ownership interest in the TPF that can be "recaptured." Dkt. 175 at 11.

Echo might also be arguing that Insight owned the TPF by virtue of the master lease agreement and assigned that ownership interest to Icon—and through Icon to Echo—when it executed the reassignment agreement. *See id.* at 17–18. But like the assignment agreement, the reassignment agreement assigned "all of Icon's legal and beneficial right, title, interest in and ownership of Icon's claims against [United] arising under [the subcontract]." Dkt. 175-7 at 1. Once again, Insight assigned claims, not any ownership interest in the TPF.

21

Echo reaches a contrary conclusion by interpreting "arising under [the subcontract]" to include an ownership interest, but it ignores the language expressly limiting the reassignment to "Icon's claims against [United]." *Id.* As noted, the court must give effect to every part of the contract, not just the parts that benefit one party, *see Coker*, 650 S.W.2d at 393, and doing so makes Echo's argument fail.

Finally, Echo argues that, by signing the mutual release, Insight "voided" its right to claim any ownership of the TPF pursuant to the master lease agreement. *See* Dkt. 175 at 11. But releasing one another from their contractual obligations did not relinquish either party's purported ownership interest in the TPF. The mutual release contains no language that could be construed otherwise. *See* Dkt. 175-9.

For all of those reasons, Echo cannot show that Insight breached any contract. Insight is therefore entitled to summary judgment on Echo's breach-of-contract claim.

### B. Tort claims

As noted, Echo alleged three state-law tort claims: money had and received, conversion, and tortious interference. Dkt. 163 at 7–10. Each of those claims is premised on an assertion that Echo is entitled to proceeds from Insight's settlement with United and sale of the TPF. Because Echo has no entitlement to either sum of money, those claims cannot survive, either.

The parties' supplemental choice-of-law briefing does not address which State's law applies to Echo's tort claims. *See* Dkts. 187, 188. Instead, both parties assume that Texas law applies. *See, e.g.*, Dkts. 175 at 21–22 (citing Texas cases), 178 at 13 (citing a federal case applying Texas law). As explained, the court applies Texas's choice-of-law rules, *Mitchell v. Lone Star Ammunition, Inc.*, 913 F.2d 242, 249 (5th Cir. 1990) (applying Texas's most-significant-relationship test to a case not governed by a contractual choice-of-law clause), which look only to the parties' proposals as to which State's law applies, *see, e.g.*, *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 726 (5th Cir. 2003) (considering only the States the parties proposed), *opinion modified on denial of*

22

*reh'g*, 355 F.3d 356 (5th Cir. 2003); *Mitchell*, 913 F.2d at 249. The court has identified no reason to look beyond the parties' assumption that Texas law governs Echo's tort claims.

Each of those claims requires Echo to show that Insight misappropriated or interfered with money or property to which Echo was entitled. Under Texas law, a plaintiff asserting a claim for money had and received must show that the "defendant holds money which in equity and good conscience belongs to [it]." *Staats v. Miller*, 243 S.W.2d 686, 687 (Tex. 1951). Conversion requires, among other things, proof that that there was an "unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights." *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971). And tortious interference requires the plaintiff to show that "an outsider to [a] contract willfully and intentionally interfered with it" and "suffered actual damage or loss." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002).

Echo premises its tort claims on assertions that Insight misappropriated or exercised dominion over money belonging to it or interfered with its contractual rights by settling with United and selling the TPF. Dkts. 163 at 8–10, 175 at 21–23. But as already explained, Echo has failed to demonstrate that it had any right to the proceeds of Insight's settlement with United or sale of the TPF. For that reason, Echo cannot show that Insight held money that in good conscience belonged to it, that Insight wrongfully exercised dominion over its property, or that Insight interfered with its contractual rights, causing it damages.

In short, Echo's state-tort claims cannot succeed. That means Insight is entitled to summary judgment on them.

### C. Declaratory judgment

Echo asks the court to declare that

1) it is the rightful owner of all claims arising out of or relating to the [United] subcontract with Icon, including the [master] lease agreement; 2) Insight was and is not entitled to pursue any claims in contract or equity owing to the Reassignment of claims back to Icon and therefore Echo; 3) Echo is the sole party with authority to pursue any claims against [United] . . . ; 4) *Both* the Master Lease and Net Lease agreements as well as the assignment of claims agreement never existed *ab initio*; and 5) [United] has waived its arbitration agreement it the subcontract by crossclaiming against [Echo] as to Echo's substantive right of recovery.

Dkt. 163 at 7–8.

Insight does not adequately address Echo's request. *See* Dkt. 178 at 13. But the Declaratory Judgment Act is "an authorization, not a command." *Pub. Affs. Assocs., Inc. v. Rickover*, 369 U.S. 111, 112 (1962). The decision to dismiss a declaratory-judgment action is within the sound discretion of the court. *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 494 (1942).

"One of the most important considerations that may induce a court to deny declaratory relief is that the judgment sought would not settle the controversy between the parties." 10B Mary Kay Kane & Adam N. Steinman, Federal Practice & Procedure § 2759 (4th ed. 2025 supp.). If a declaratory judgment is predicated upon the same issues as a direct action and the court decides those issues, it may dismiss the declaratory judgment action. *Le-Vel Brands, LLC v. DMS Nat'l Health, LLC*, No. 4:20-cv-398-SDJ, 2021 WL 3048445, at *2 (E.D. Tex. July 20, 2021). Because Echo's request for declaratory relief is premised on its claims of entitlement to the TPF and Insight's settlement proceeds, which the court has addressed through its resolution of the primary claims, the court will exercise its discretion to dismiss the declaratory-judgment claim.

## III. Attorneys' fees

In its motion for summary judgment, Insight requests an award of the attorneys' fees it has incurred defending against Echo's claims. *See* Dkt. 178 at 15–16. It relies on the reassignment agreement's prevailing-party clause, which reads:

> In case suit shall be brought for the alleged breach of this Agreement, the prevailing party in such action shall be entitled to recover from the unsuccessful party its reasonable attorneys' fees, costs and expenses incurred by the prevailing party in the prosecution of said suit or in successfully defending against said suit.

Dkt. 175-7 at 3. To the extent that Echo's claims are based on its allegation that Insight violated the reassignment agreement, Insight argues that it is entitled to recover its fees. *See* Dkt. 178 at 15.

Echo responds that Insight failed to allege a claim against it for attorneys' fees and, therefore, waived any right it may have had to seek them. *See* Dkt. 179 at 28. Echo further argues that, because it is not a party to the reassignment agreement, it may not be charged with any contractual burdens imposed by that agreement. *Id.* at 29. In its reply, Insight argues that Echo's claims arise under the reassignment agreement and that Echo itself sought attorneys' fees pursuant to that agreement. Dkt. 180 at 10. Neither party cites any legal authority in support of its position.

"The fee applicant bears the burden of establishing entitlement to an award." *Amawi v. Paxton*, 48 F.4th 412, 416 (5th Cir. 2022) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)). Insight has not established entitlement to fees it did not claim in its initial pleading. *See United Indus., Inc. v. Simon-Hartley, Ltd.*, 91 F.3d 762, 765 (5th Cir. 1996) (holding that a party must generally "put its adversaries on notice that attorneys' fees are at issue" by "specifically pleading for attorneys' fees in the complaint"). Nor has it cited support for a conclusion that Echo, which is not a party to the reassignment agreement, is bound by the prevailing-party provision in that agreement. *See Creative Artists Agency, LLC v. Las Palmas Race Park, LLC*, No. 13-14-00015-CV, 2015 WL 6652655, at *3 (Tex. App.—Corpus Christi–Edinburg 2015, no pet.) (mem. op.) (explaining that "[g]enerally, an assignor of a contract remains liable for the obligations he originally assumed, even after the contract is assigned and 'the assignee of a contract is not responsible for the assignor's obligations unless he expressly or impliedly assumes them'" (quoting *NextEra Retail of Tex., LP v. Investors Warranty of Am., Inc.*, 418 S.W.3d 222, 226–27 (Tex. App.–Houston [1st Dist.] 2013, pet. denied))). In short, Insight has not met its burden to show an entitlement to attorneys' fees.

## CONCLUSION

It is **ORDERED** that:

1) Echo's motion for partial summary judgment, Dkt. 175, is **DENIED**;

2) Insight's motion for summary judgment, Dkt. 178, is **GRANTED** as to Echo's claims for breach of contract, money had and received, conversion, and tortious interference, Dkt. 163 at 7–10;

3) Echo's declaratory-judgment claim, *id.* at 7–8, is **DISMISSED**; and

4) Insight's request for attorneys' fees, Dkt. 178 at 15–16, is **DENIED**.

So **ORDERED** and **SIGNED** this 11th day of March, 2026.

_____

Bill Davis
United States Magistrate Judge

26